**NORTHWEST ENVIRONMENTAL ADVOCATES, Plaintiff,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY and the National Marine Fisheries Service, Defendants,**

**The State of Oregon, Northwest Pulp & Paper Assoc., Oregon Forest Industries Council, Oregon Metallurgical Corp., Intervenor-Defendants.**

**No. CV-01-510-HA.**

United States District Court, D. Oregon.

March 31, 2003.

Aaron Courtney, Bart A. Brush, Portland, OR, for Plaintiff.

G. Scott Williams, Kent E. Hanson, James A. Maysonett, U.S. Department of Justice, Washington, D.C., for Defendants.

Hardy Myers, Karen L. Moynahan, Oregon Department of Justice, Salem, OR, for Intervenor–Defendant State of Oregon.

Jay T. Waldron, Brian J. King, Timothy M. Sullivan, Schwabe, Williamson & Wyatt, Portland, OR, for Intervenor–Defendants Northwest Pulp & Paper Assoc. and the Oregon Forest Industries Council.

Scott Kaplan, Beverly Pearman, Michael Campbell, Stoel Rives, Portland, OR, for Intervenor–Defendant Oregon Metallurgical Corp.

OPINION AND ORDER

HAGGERTY, Chief Judge.

Before the court are the parties' cross-motions for summary judgment (Docs.# 49, 66, 70, 76) and plaintiff's Motion to Amend the Complaint (Doc. # 97). For the following reasons, the cross-motions for summary judgment are granted in part and denied in part. Plaintiff's Motion to Amend is denied.

## BACKGROUND

This action arises from various water quality standards promulgated by the Oregon Department of Environmental Quality (DEQ) and approved by the federal Environmental Protection Agency (EPA). Plaintiff is an environmental organization whose members use and enjoy Oregon waterways. Plaintiff moves for declaratory and injunctive relief against EPA for its conduct involving the approval of Oregon's water quality standards. Defendants cross-move for summary judgment.

## STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

tled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The primary facts of this litigation are largely undisputed and summary judgment rulings are appropriate on all claims.

Judicial review of an agency action is governed by the Administrative Procedure Act (APA). An agency action may be set aside if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). This is a deferential standard which presumes that the agency's decision is valid. *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.1976). Nevertheless, the court must "assure itself that the agency decision was based on a consideration of the relevant factors." *Id.* (citations omitted). Although the "court's inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). To that end, this court should "defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential to a truly informed decision...." *Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) (citations omitted).

The court may not find an agency action to be "arbitrary or capricious unless there is no rational basis for the action." *Friends of the Earth v. Hintz,* 800 F.2d 822, 831 (9th Cir.1986) (citing *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1027 (9th Cir.1980)). The court must be "at its most deferential" when reviewing an agency's scientific determinations. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

## DISCUSSION

### I. Water Quality Standard for the Lower Willamette River

Congress enacted the Clean Water Act (CWA) in 1972 in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Water quality standards are created and reviewed by the states at least every three years in a process known as "triennial review." 33 U.S.C. § 1313(c)(1). States must submit all new and revised standards to EPA for review. If EPA rejects a standard, it must notify the state within 90 days of the submission. If the state fails to act within 90 days, EPA shall "promptly prepare and publish proposed" water quality standards for the state. 33 U.S.C. § 1313(c)(4)(A).

DEQ completed its triennial review of its water quality standards on January 11, 1996, and submitted certain revisions to EPA on July 26, 1996. Oregon's revised standards included, *inter alia,* a 68 F temperature criterion for salmonid migration and rearing in the Lower Willamette River. On July 22, 1999, EPA rejected the criterion. Oregon took no action within 90 days of EPA's rejection. Although Oregon's inaction triggered a mandatory duty on the part of EPA to promulgate a revised standard, EPA has done nothing for over three years.

The core issue presented is whether the court has subject matter jurisdiction to hear plaintiff's challenge to EPA's failure to revise the water quality standard for the lower Willamette River. Plaintiff brings its claim under the citizen-suit provision of the CWA. 33 U.S.C. § 1365(a)(2). Jurisdiction under this provision exists only if the agency has failed to exercise a nondiscretionary duty. Although the parties agree that EPA was required to "promptly" promulgate new standards in the wake of Oregon's failure to do so, the

parties disagree as to whether the requirement under § 303(c)(4) to "promptly promulgate" establishes a nondiscretionary duty on the part of EPA. 33 U.S.C. § 1313(c)(4)(A).

█ Defendants contend that a duty is nondiscretionary *only* if the agency is mandated to act by the CWA under a "date-certain" deadline. A reviewing court should give "full effect" and follow the plain meaning of a statute whenever possible. *United States v. Turkette,* 452 U.S. 576, 593, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). In other contexts, the Supreme Court has noted that use of the term "shall" is indicative of "mandatory language." *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 34–35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998); *Pierce v. Underwood,* 487 U.S. 552, 569–70, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). Other courts have found mandatory language in § 303(c)(4)'s demand that EPA "*shall* properly prepare and publish" revised water quality standards. *Raymond Proffitt Found. v. U.S. EPA,* 930 F.Supp. 1088, 1097 (E.D.Pa.1996) (emphasis added). The *Proffitt* court found that the use of the term "shall" indicated a Congressional intention to mandate EPA to promulgate revised standards upon a state's failure to revise the criteria following EPA's disapproval. This interpretation is consistent with the statutory scheme that vests primary authority for the promulgation of water quality standards in the states, but requires EPA's oversight. *See id.*

The Ninth Circuit has addressed the question and reached the same result. The court found that § 303(c)(4)'s reference to "promptly promulgate" indicates mandatory language. *Idaho Conservation League, Inc. v. Russell,* 946 F.2d 717, 720 (9th Cir.1991). EPA correctly notes, however, that in *Idaho Conservation League* the Ninth Circuit was required only to find that the plaintiff's claim was "not frivolous." Notwithstanding the low threshold of that inquiry, the court's conclusions have bearing on the issues here:

> The plain language of Section 303(c) supports plaintiffs' view. Section 303(c)(3) uses mandatory language, stating "the Administrator *shall* promulgate such standard pursuant to [**Section 303(c)(4)**]." The same mandatory language appears in Section 303(c)(4): "The Administrator [of EPA] *shall* promptly prepare and publish proposed regulations setting forth a revised or new water quality standard" if a state fails to adopt regulations within the specified period. *Id.* § 1313(c)(4) (emphasis added). There is no case law suggesting § 303(c) leaves the Administrator any discretion to deviate from this apparently mandatory course.

*Idaho Conservation League,* 946 F.2d at 720 (citations omitted).

Interpreting the nondiscretionary nature of § 303(c)(4)(A), another court in this circuit found that "[a]s a matter of law, EPA . . . failed to perform its mandatory duty" by not preparing and publishing water quality standards following the state of Idaho's failure to do so after EPA rejected the state's initial proposal. *Idaho Conservation League v. Browner,* 968 F.Supp. 546, 548 (W.D.Wash.1997).

█ Based on the plain language of § 303(c)(4)(A) and the statutory scheme established by the CWA, EPA is under a nondiscretionary duty to promptly promulgate revised standards upon a state's failure to submit its own revisions within 90 days of the notice of disapproval. This holding is consistent with Congress's intent to allow states the "first bite" at promulgating their own water quality standards. Even upon rejection by EPA, a state may still maintain control over the process by submitting a new proposal

within 90 days following EPA's rejection. However, a state's failure to submit revisions in a timely fashion triggers EPA's nondiscretionary duty to act. The duty is mandatory; to hold otherwise would allow the agency's inaction to leave old standards or no standards in place, thereby defeating the CWA's purpose of restoring and maintaining "the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

Having determined that EPA had a nondiscretionary duty to promulgate water temperature criteria for the Willamette River in a prompt fashion, the only question that remains is whether EPA has in fact acted "promptly." Clearly it has not. The EPA concedes that it disapproved DEQ's revised water temperature criterion for the lower Willamette River. Although declining to announce any bright-line rule, other courts applying § 303(c)(4)(A) have found that delays of seven and 19 months were not prompt. *Idaho Conservation League,* 968 F.Supp. at 549; *Raymond Proffitt Foundation,* 930 F.Supp. at 1097. Here, over three years have passed since EPA rejected Oregon's submission. Accordingly, EPA has failed to exercise its nondiscretionary duty under § 303(c)(4)(A).

Plaintiff's motion for summary judgment on the first claim for relief is granted. EPA shall prepare and publish a revised water quality temperature criterion for the lower Willamette River in compliance with 33 U.S.C. § 1313(c)(4)(A) and within the time-line provided below.

### II. Water Quality Standard for the Columbia River

Unlike the state's conduct regarding the Willamette River discussed above, Oregon never submitted a revised temperature criterion for the Columbia River. Therefore, EPA was under no duty to review the existing Columbia River criterion of 68 F for salmonid migration and rearing because there was no "new or revised" criterion to evaluate. 33 U.S.C. § 1313(c)(4)(A).

Notwithstanding the absence of new or revised criteria, EPA enjoys the discretion to determine whether a new or revised standard is necessary. 33 U.S.C. § 1313(c)(4)(B). Plaintiff asserts jurisdiction to challenge EPA's failure to do so by again relying upon the CWA's citizen-suit provision. "[I]n any case where [EPA] determines that a revised or new standard is necessary to meet the requirements" of the CWA, EPA is mandated to promulgate a new standard. 33 U.S.C. § 1313(c)(4)(B). Thus, although the initial decision to review a state's existing standard is discretionary, the duty to promulgate new standards becomes nondiscretionary upon the agency's determination that the existing standards are inadequate. The issue presented is whether EPA ever made a finding that a new or revised standard for the Columbia River was necessary.

In a biological opinion drafted by EPA, it determined that the 68 F criterion for the Columbia River was "likely to adversely affect" chum salmon. *See* National Marine Fisheries Service (hereinafter "NMFS") Ex. 1 at 34–35. In fact, the 68 F criterion for salmonid migration and rearing was found to "pose[ ] a risk to their viability." *Id.* In order to reach the Willamette River, salmonids must necessarily travel through the Columbia River. Because EPA rejected the 68 F for the Willamette, plaintiff contends the agency must also have rejected that same criterion for the Columbia. NMFS found that the "criterion of 68 F ... does not protect anadromous fish rearing and smolification in the Columbia and Willamette Rivers." NMFS 5 at 3. Plaintiff argues that EPA's rejection of the 68 F criterion for the Willamette

was based on the same NMFS documents that also rejected the criterion for the Columbia.

■ NMFS's conclusions do not by themselves establish a sufficient finding that would trigger EPA's duty to promulgate a revised criterion. Plaintiff contends that there is no logical basis for distinguishing between the criteria for the Columbia and Willamette Rivers when the same salmonid species must travel through the Columbia in order to reach the Willamette. Although plaintiff's contentions may be true, the court is not permitted to render expert determinations nor to question the Administrator's discretionary decision to review the Columbia standard.

The agency never "determine[d] that a revised or new standard [was] necessary" for the Columbia. 33 U.S.C. § 1313(c)(4)(B). Because the condition precedent for bringing a citizen suit has not been met, this court lacks jurisdiction over plaintiff's second claim for relief. Defendants' motion for summary judgment on that claim, therefore, must be granted.

### III. Antidegradation Implementation Policy

An antidegradation implementation policy works to maintain the existing uses of waterways. Plaintiff argues that Oregon has never submitted an antidegradation implementation plan; alternatively, plaintiff argues that even if Oregon has submitted a plan, it is "significantly inadequate." In order for plaintiff to challenge Oregon's implementation policy, it must first bring its challenge under an appropriate statute. To that end, plaintiff challenges the Administrator's purported approval of Oregon's implementation policy pursuant to the citizen-suit provisions of the CWA. 33 U.S.C. § 1365(a)(2). Alternatively, plaintiff contends that the agency action is "arbitrary and capricious," as that term is defined in the APA. 5 U.S.C. § 706(2)(A).

Clearly, Oregon has in fact submitted an implementation plan. Oregon's implementation policy is contained in OAR 340–041–0026(1)(a), which states, "The standards and policies set forth in OAR 340–041–0120 through 340–041–0962 are intended to implement the Antidegradation Policy." Skeletal though it may be, there is an implementation policy manifested in the wide set of referenced regulations.

Having determined that the policy exists in some form, the court next considers whether that policy is "significantly inadequate," as plaintiff contends. The court must also consider whether EPA's failure to exercise discretionary review over the implementation "plan" was arbitrary and capricious.

#### A. Mandatory Duty under CWA § 303(c)(4)(A).

As discussed above, EPA is under a nondiscretionary duty to promulgate new standards only after: (1) the state has submitted a revised or new standard to EPA; (2) EPA has rejected those standards; and (3) the state fails to revise the submissions. 33 U.S.C. § 1313(c)(4)(A). The parties stipulate that during the relevant triennial review period Oregon submitted no new or revised implementation policy. The policy that EPA claims is Oregon's implementation plan was promulgated in 1991 and approved by EPA on January 27, 1992. OAR 340–041–0026(1)(a). Since it had nothing to review during the triennial review process at issue in this litigation, EPA had no mandatory duty to act under 33 U.S.C. § 1313(c)(4)(A), absent a finding by the court that Oregon "constructively" submitted an inadequate plan.

Plaintiff contends that Oregon's many years of refusal to submit a complete antidegradation policy constitutes a constructive submission to EPA. Under the "con-

structive submission" doctrine, upon a state's extended delay or complete failure to submit necessary standards to EPA, the lack of a submission will be regarded as a submission itself. The parties agree that no court has applied the theory of constructive submission to the sections of the CWA at issue.

The doctrine has been applied in the context of total maximum daily loads (TMDLs) pollution control programs. The Seventh Circuit has held that a state's failure to submit proposed TMDLs for an extended period of time constituted a constructive submission. *Scott v. Hammond,* 741 F.2d 992, 996 (7th Cir.1984). However, the decision was premised on the court's perception that EPA was handcuffed from acting until a state had made an actual submission. *Id.* at 996–97. The rationale was that a state could not be allowed to thwart the purposes of the CWA simply by failing to submit a required program plan. The court concluded that because EPA could not act until the state had submitted a TMDL plan, it was necessary to constructively view the absence of a submission as a submission itself in order to allow EPA to promulgate proper standards.

The context of the implementation plan involved in this litigation is distinct from TMDLs. During the water quality standards and triennial review process, EPA maintains authority to promulgate standards in circumstances where "the Administrator determines that a revised or new standard is necessary ...." 33 U.S.C. 1313(c)(4)(B). It need not wait for the state's submission. Thus, if EPA is faced with state obstinance, the agency may promulgate its own standard when it determines that such promulgation is necessary. Unlike the TMDL context in *Scott,* the need to apply a constructive submission analysis here is absent.

Even if the constructive submission doctrine were relevant, the doctrine would not apply under these facts. *See San Francisco Baykeeper v. Whitman,* 287 F.3d 764, 769 (9th Cir.2002). As discussed above, Oregon does have a bare-bones implementation plan. Accordingly, the complete absence of state activity found in recognized constructive submission contexts is not present here. Because there was no "new or revised" rule for EPA to review, plaintiff's claim under CWA § 303(c)(4)(A) fails.

**B. Mandatory Duty under CWA § 303(c)(4)(B)**

The Administrator may, in her discretion, review existing state water quality standards. There is no evidence in the record showing that the Administrator reviewed Oregon's implementation policy or made a determination that Oregon's submissions were inadequate. Therefore, this court lacks jurisdiction to entertain a claim brought under 33 U.S.C. § 1313(c)(4)(B). *National Wildlife Federation v. Browner,* 127 F.3d 1126, 1130 (D.C.Cir.1997) (referring to the discretionary nature of the Administrator's determinations under § 303(c)(4)(B)).

**C. Application of the Implementation Policy to the APA**

The CWA mandates EPA to confirm that state submissions are consistent with applicable CWA requirements. 33 U.S.C. § 1313(c)(3). States must include an antidegradation policy as an essential component of the statewide water quality standards that are presented as part of the triennial review process. 40 C.F.R. §§ 131.6(d), 131.12(a); *see PUD No. 1 of Jefferson County v. Washington Dep't of Ecology,* 511 U.S. 700, 705–06, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) ("A 1987 amendment to the Clean Water Act makes

clear that § 303 also contains an 'antidegradation policy'—that is, a policy requiring that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation").

Contrary to EPA's contentions, the agency's failure to exercise its discretionary duty under CWA § 303(c)(4)(B) is by itself a reviewable agency action under the APA. *See* Defendants' Memorandum in Support of Cross-Motion for Summary Judgment at 18 n. 12 ("Plaintiff cannot challenge under the APA the scope of EPA's approval/disapproval decision, which under the CWA is confined to a review of the new or revised standards submitted by Oregon."). *But see National Wildlife Federation v. Browner,* 1996 WL 601451 at *6 (D.D.C.1996) ("[S]uch a discretionary decision is not committed to the agency as a matter of law ... and EPA's failure to exercise its discretion under 33 U.S.C. § 1313(c)(4)(B) could be subject to a proper challenge under the APA.") (citing *Heckler v. Chaney,* 470 U.S. 821, 829–30, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *N.A.A.C.P. v. Sec'y of Housing and Urban Dev.,* 817 F.2d 149, 160 (1st Cir.1987); *Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir.1985)).

Here, there are clear standards for both the state and EPA to evaluate with regard to implementation plans. The agency's own regulations require the state to "develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy ...." 40 C.F.R. § 131.12(a). The policy must "be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation." *PUD No. 1 of Jefferson County,* 511 U.S. at 705–06, 114 S.Ct. 1900. Because this process is not entirely committed to EPA's discretion as a matter of law, EPA's inaction regarding Oregon's sparse implementation policy is reviewable under the APA.

This conclusion is consistent with the administrative scheme established by the CWA and the APA. If defendants' contention that EPA's inaction is entirely unreviewable were taken to its logical end, the agency could thwart the legislative scheme by failing to act in any number of circumstances without judicial review. In the process, the CWA's goal of restoring and maintaining "the chemical, physical, and biological integrity of the Nation's waters" could be completely undermined. 33 U.S.C. § 1251(a). In order to fulfill the CWA's goal of having EPA oversee state water quality standards and to enhance that oversight with judicial review, the court will consider EPA's failure to exercise its § 303(c)(4)(B) discretion under an "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A).

Defendants erroneously assert that plaintiff's claim is barred by the relevant six-year statute of limitations for review of agency action. 28 U.S.C. § 2401(a). Because EPA approved the plan in 1992, defendants claim that the current challenge is time-barred. If plaintiff were challenging the 1992 approval itself, defendants would be correct. However, plaintiff challenges EPA's failure to exercise its discretionary duties under CWA § 303(c)(4)(B). DEQ completed its triennial review of its water quality standards on January 11, 1996, and submitted its plan to EPA on July 26, 1996. EPA 15. On July 22, 1999, EPA rejected certain criteria at which time plaintiff's ability to challenge EPA's failure to exercise its discretionary duty "first accrued." This is the relevant time-frame from which to evaluate EPA's failure to reject Oregon's implementation plan. As such, plaintiff's APA challenge is not time-barred.

The entirety of Oregon's "implementation plan" is a one sentence reference to

Oregon's entire body of water quality standards. The "implementation plan" states merely that the standards are "intended to implement the Antidegradation Policy." OAR 340–041–0026(1)(a).

This court may not find an agency action to be "arbitrary or capricious unless there is no rational basis for the action." *Friends of the Earth,* 800 F.2d at 831. Defendants have failed to supply any rational basis for the EPA's failure to exercise its discretionary duties to promulgate new rules for this mandatory element of Oregon's water quality standards. Defendants' briefing argues only that plaintiff's APA claim is procedurally barred. On the other hand, plaintiff correctly notes that Oregon's water quality standards do not contain even a semblance of an implementation plan, which, as discussed above, is a required element of such standards. An omnibus reference that the state's entire water quality standards "will be implemented" can not rationally be read as a "policy" that specifically identifies the "methods for implementing such a policy ...." 40 C.F.R. § 131.12(a). The policy must "be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation." *PUD No. 1 of Jefferson,* 511 U.S. at 705–06, 114 S.Ct. 1900. In the absence of a rational basis for finding that Oregon's one-sentence "policy" in any way identifies requisite implementation methods, the court grants plaintiff's motion for summary judgment on its third claim for relief. EPA is ordered to promulgate an antidegradation implementation plan for Oregon's waters. The promulgation will comport with the time-line provided below.

## IV. Revised Numeric Water Quality Criteria

Like all states, Oregon must identify designated uses of waterways and promulgate water quality standards that protect those uses. 33 U.S.C. § 1313(c)(2)(A). One such designated use is the protection of listed salmonid and bull trout species.

DEQ completed its triennial review of its water quality standards on January 11, 1996, and submitted certain revisions to EPA on July 26, 1996. EPA 15. The only standards relevant to this claim are the following numeric criteria: (1) 64 F for salmonid rearing; (2) 50 F for bull trout spawning and rearing; and (3) Oxygen criterion of 6.0 mg/L for waters during salmonid spawning.

### A. 64 F Rearing Temperature for Salmonids

Plaintiff challenges EPA's approval of one of Oregon's numeric criteria because it allegedly fails to protect the designated uses of salmonid rearing. 33 U.S.C. § 1313(c)(2)(A). EPA determined in its biological opinion under the Endangered Species Act (ESA) that the 64 F rearing temperature criterion would likely adversely affect salmonids. EPA found that the temperature "poses a significant and unacceptable risk to the viability" of certain threatened species. NMFS 12 at 31. EPA expert Cara Berman recommended that the rearing temperature criterion be reevaluated in light of the adverse effects it would cause to the salmonid population. *Id.* Similar findings were made by NMFS's review of the 64 F rearing criterion.

In addition to these findings, EPA determined that Oregon's system of designating uses of specific waterways was deficient. As the numeric criteria indicate, different standards apply to different waterways depending on whether threatened species are spawning, rearing, or migrating. These criteria are meaningful and enforceable only if the state is able to designate when and where these particular uses may occur. EPA found that there is

no use information for certain waterways. When Oregon identified spawning times and places, such determinations were found by NMFS to be inaccurate. NMFS 1 at 20–21. Therefore, plaintiff contends that not only is the 64 F salmonid rearing criterion deficient, it is completely unenforceable because Oregon has failed to identify the time and location where the criterion would apply. Plaintiff alleges that by approving this criterion, EPA acted arbitrarily and capriciously.

In its approval of Oregon's standards, EPA specifically addressed several of the issues plaintiff raises. EPA compared Oregon's rearing standard to EPA's Quality Criteria for Water (i.e. "Gold Book"), which established 64 F as the maximum weekly average temperature for the rearing of certain listed salmonids. Although the 64 F criterion was in the maximum range for rearing, it was still within acceptable limits. The temperature was found to be acceptable when considered in the context of the entire water quality plan. Further, because 64 F is the maximum temperature that can be reached in the warmest stretches of a waterway, much of the river will be colder than 64 F during the warmest period of the year. With regard to EPA and NMFS findings that the criterion would adversely affect salmonids, defendants correctly note that the findings were made in the context of an ESA analysis, which is distinct from the question of protecting designated uses. 40 C.F.R. § 131.11(a). EPA found that a criterion can adversely affect certain populations while simultaneously protecting designated uses.

■ With regard to the 64 F temperature itself, there is a rational basis for EPA's determinations. The agency considered the criterion in the context of the entire body of Oregon's water quality standards and found that it protected designated uses. EPA 67 at 5. Based on the substantial deference this court must give to factual determinations based on an agency's expertise, the court finds no violation of the APA in EPA's approval of the 64 F criterion itself. *See Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (setting forth the high level of deference the court must give to factual determinations made by the agency in its expert capacity).

However, the issue of time and place designations is another matter. Oregon maintains Beneficial Use Tables that designate the time and place where threatened species rear, spawn, and migrate. OAR 340–041–0202. EPA contends that it did not review these tables because Oregon had not revised them. Therefore, defendants assert, there is no final agency action for this court to review. 33 U.S.C. § 1313(c)(2)(A), (c)(3).

The court disagrees. Unlike other states, which simply designate certain temperature criteria for entire bodies of water or entire classes of waterways, Oregon elected to take a more particularized approach. Oregon issued different water criteria based on specific uses. The 64 F criterion only applies to waterways where salmonid rearing occurs. The 64 F criterion would be meaningless absent a particular designation as to which waterways host such rearing. If Oregon's system is completely inaccurate in designating the waterways where spawning, rearing, or migration occurs, then neither EPA nor DEQ would be able to enforce the revised criteria. Thus, EPA's approval of the 64 F criterion was specifically premised on the state's ability to designate where rearing occurs. The fact that Oregon did not revise its Beneficial Use tables fails to change the fact that the state did revise certain criteria which are directly tied to the tables. Accordingly, there must at least be a rational basis for EPA's approv-

al of the numeric criteria that specifically rely on time and place designations for their effective enforcement.

EPA's own review of the temperature standards noted, "Of concern in this analysis is the representativeness, completeness, and accuracy of the stream and salmonid use data as well as the accuracy of the beneficial use designations." NMFS 12 at 11. The report found:

> [L]imited or no information exists for certain water bodies. Additionally, the extent of our knowledge concerning distribution and life history requirements of native salmon and charr should not be overestimated. Presence-absence data alone should not be used to define species ranges that are dynamic and vary over time according to natural disturbance regimes and habitat suitability.

*Id.*

Findings by both EPA and NMFS identified several problems with Oregon's system for designating uses. The agencies found that Oregon lacked critical information on waterways and misidentified the times and places where spawning, rearing, and incubation occurred. NMFS 1 at 20; 12 at 11.

Similar findings were made with regard to Oregon's ability to identify Oregon bull trout migration areas. Oregon established a 50 F criterion for bull trout spawning and rearing. EPA concluded that "migration corridors must be adequately protected to safeguard remaining populations and to restore species distribution and integrity." NMFS 12 at 46–47. EPA noted, "Although the numeric criterion of 10 C [50 F] adequately protects migrating bull trout, Oregon has not designated migration corridors for protection." *Id.* at 48. The assessment concluded that, "As migratory corridors are omitted from the designation, the bull trout criterion of 10 C is likely to adversely affect Columbia River Basic bull trout and Klamath Basin bull trout." *Id.* at 47.

In its approval of the revised criteria, EPA failed to cite adequate evidence or reasons that addressed these shortcomings. Designated uses are a mandatory part of a state submission and must be considered by EPA in approving a particular criterion. 40 C.F.R. §§ 131.5(a)(1), (a)(2), 131.6. Apparently conceding the inadequacy of Oregon's time and place designations, defendants contend that Oregon "has committed to work with the federal government to ensure that its identification is as accurate as possible." Defendants' Memorandum in Support of Cross–Motion for Summary Judgment at 31; EPA 60 at 3–4. In its biological assessment, EPA conceded that Oregon has not submitted time and place designations for bull trout spawning and rearing. EPA 43 at 95. EPA states that Oregon will "submit those designations at the next triennial review." Defendants' Reply Memorandum at 10; EPA 38 at 2. The court is left only to wonder how the 50 F criterion for bull trout spawning and rearing has been enforced over the last seven years if Oregon has failed to identify the migratory corridors to which the criterion applies.

Without accurate time and place designations, EPA cannot approve Oregon's revised criteria and comply with the CWA. The process that should have been followed was undertaken in Idaho, where EPA included specific time and place designations in the standards. EPA 26 at 41173 ("EPA disagrees with the commentators who argue that waterbodies do not need to be specific for bull trout temperature criteria. A water quality standard cannot be implemented unless it applies to a specified location"). As such, EPA's approval of the designations in Oregon was arbitrary and capricious because the agency failed to address this key component of

the criteria and therefore did not protect the designated uses of salmonid rearing and bull trout rearing and spawning. 40 C.F.R. § 131.12(a)(1).

Summary judgment is granted in favor of plaintiff on its fourth and sixth claims for relief. EPA's approval of the 64 F criterion for salmonid rearing and the 50 F criterion for bull trout rearing and spawning was arbitrary, capricious, and not in accordance with the CWA. The approval failed to ensure the protection of threatened salmonids and bull trout. EPA is ordered to rescind its approval of these criteria and to promulgate revised criteria that comply with the requirements of the CWA. These actions shall be taken in accordance with the time-line provided below.

### B. Intergravel Dissolved Oxygen Criteria (IGDO)

A dissolved oxygen standard measures the amount of oxygen in the water between gravels in a riverbed. This standard is especially important for the health of salmonid embryos. The higher the IGDO standard is set, the more protective it is for threatened species. Oregon submitted and EPA approved an IGDO criterion of 6.0 mg/L for waters supporting salmonid spawning.

Prior to approval, EPA's experts concluded that the 6.0 mg/L criterion would adversely affect listed salmonids. EPA 43 at 65–66. The stress on juvenile salmon is exacerbated by elevated water temperatures, according to EPA. Studies cited by EPA in its biological assessment found that salmonid embryos begin to feel the effects of oxygen deprivation at 8.0 mg/L, and that 5.0 mg/L is lethal. EPA 43 at 64. EPA commented, "8mg/l IGDO action level is a more appropriate target for protection of ESA-listed salmonids. However, the language in the Oregon rules does not mandate follow up on this action level." EPA 43 at 66.

Plaintiff attacks the 6.0 mg/L criterion because EPA's approval was premised on Oregon's unenforceable commitment to apply a higher standard. During the review process, Oregon agreed to use an 8.0 mg/L standard for purposes of including waters on the state's list of impaired waters prepared for CWA § 303(d). However, Oregon's IGDO standard did not compel the State to put waterways falling below 8.0 mg/L on its § 303(d) list. Based on Oregon's commitment, NMFS concluded that the IGDO standard "is likely to meet the biological requirements of the listed species of anadromous salmonids." NMFS 1 at 20.

EPA's approval of the standard was based on the finding that the 6.0 mg/L criterion would not adversely affect listed salmonids because Oregon would not use the lower criterion if threatened or endangered species were present. EPA 43 at 66. The basis of this finding is arbitrary and capricious. Oregon's "commitment" to use a more protective standard has no bearing on the court's review of the specific water quality criteria approved by EPA. If Oregon had specifically promulgated an 8.0 mg/L for threatened species, the situation would be different. Here, the standard is 6.0 mg/L for salmonid spawning. The court must consider whether there is sufficient evidence to support EPA's finding that such a criterion comports with the CWA.

Numeric criteria must be designed to protect designated uses. 40 C.F.R. § 131.6(c). Both NMFS and EPA found that a 6.0 mg/L would dramatically and negatively impact salmonid spawning. Further, the pre-approval documents concluded that "[t]he 8.0 mg/l IGDO action level is a more appropriate target for protection of ESA-listed salmonids." EPA 43

at 66. Defendant contends that EPA's approval was premised on its finding that the IGDO criterion was consistent with the EPA's "Gold Book." Although partially true, the approval was also premised on the State's unenforceable promise to use the 8.0 mg/L criterion for certain species. Defendants concede that although Oregon "committed" to following a higher standard, that commitment was not actually enforceable. Defendants' Memorandum in Support of Cross–Motion for Summary Judgment at 25.

EPA also premised its approval on the fact that DEQ "has committed to correct its table for salmonid spawning with in the 1999–2002 Triennial Review regarding the geographic area and time period during which the spawning criterion for dissolve[d] oxygen apply." EPA 68 at 10. There is insufficient evidence to show Oregon has met this commitment. Moreover, without accurate time and place designations, Oregon could not have accurately applied the standard since its 1996 approval.

Plaintiff's motion for summary judgment on its seventh claim for relief is granted. EPA is ordered to rescind its approval of the 6.0 mg/L IGDO criterion and shall prepare a revised IGDO criterion to meet the biological requirements of threatened and endangered salmonids in Oregon. This action shall occur according to the time-line provided below.

### C. Narrative Criteria

Plaintiff objects to EPA's approval of Oregon's "narrative" water quality standards. Each challenged narrative standard will be considered in turn.

#### 1. Surface Water Temperature Management Plan

Oregon submitted and EPA approved a surface water temperature management plan, which allows site-specific plans to override numeric criteria. OAR 340–041–026(3)(a)(D). DEQ can grant an exemption only if "all feasible steps have been taken to meet the criterion," and the Director determines that "the designated uses are not being adversely impacted." *Id.* EPA's regulations allow for site-specific criteria. 40 C.F.R. §§ 131.11(a), (b)(1)(ii). As is the case whenever a state revises its water quality standards, EPA must review and approve any site-specific criterion before it takes effect. 40 C.F.R. § 131.21. Because the exemptions allowed in the surface water temperature management plan are valid only if the agency determines that the plan will not adversely affect designated uses, EPA's approval of this plan is rational and survives APA scrutiny.

#### 2. 1 F Cumulative Increase

During the period that a water temperature management plan is being developed, point sources may contribute to a 1 F cumulative increase in water temperature. OAR § 340–041–026(3)(a)(F). Such an increase is allowed only upon the point source's showing that the increase will "not conflict with or impair the ability of a surface water temperature management plan to achieve the numeric temperature criteria." *Id.* Further, the increase will only be allowed if it does not impact beneficial uses. *Id.*

The plan is rational because uses may be maintained in some circumstances even if the water temperature exceeds a designated criterion. Further, there are protective mechanisms in place to prevent beneficial uses from being affected. First, the exemption itself states that beneficial uses cannot be impacted in a measurable way. Second, when sources apply for a formal variance, EPA must approve the temporary revision, and such approval will be allowed only if designated beneficial uses

are protected. EPA is committed to the position that "these revisions ... cannot take effect for CWA purposes without prior EPA approval, and nothing in the record suggests otherwise." Defendants' Reply at 13. EPA reasonably concluded that these safeguards adequately complied with the CWA's goals.

#### 3. 0.25 F Increase

Oregon's plan prohibits sources from causing a measurable increase in water temperatures, which is defined as a 0.25 F increase above numeric temperature criteria. Therefore, sources are allowed to cause an increase in temperature, so long as the increase does not exceed 0.25 F. Plaintiff charges that this increase will undermine Oregon's water quality standards through the NPDES permitting process. However, NPDES permitting must implement "any applicable water quality standard established pursuant to this Act." 33 U.S.C. 1311(b)(1)(C). Because NPDES permitting must comply with the numeric criteria, plaintiff has failed to establish how the 0.25 F increase undermines § 303(c) of the CWA.

Finally, EPA noted that the 0.25 F temperature change was selected based on the measurement error of temperature determinations. EPA 69. Plaintiff has failed to overcome the deference this court must give to "scientifically defensible" positions taken by the agency. *Natural Resources Defense Council, Inc. v. U.S. EPA,* 16 F.3d 1395, 1401 (4th Cir.1993).

Plaintiffs motion for summary judgment on the fifth claim for relief is denied as to the narrative criteria discussed above. As discussed below, plaintiff's motion for summary judgment is granted as to the fifth claim for relief regarding the alternate mixing zone rule.

### V. Alternate Mixing Zones

A mixing zone is a limited area of water where discharge is mixed with the waterway. Numeric water quality criteria can be exceeded in this zone, but acutely toxic conditions must not be present. Oregon's standard mixing zone rule requires DEQ to "define a mixing zone in the immediate area of a wastewater discharge." See OAR 340–041–0445(4). The "alternate" mixing zone rule allows for a larger area of the waterway to exceed numeric values.

The parties' contentions on this matter have taken a circuitous route during the course of briefing on these motions. Originally, plaintiff challenged EPA's alleged approval of the rule on the grounds that the approval was arbitrary and capricious. In its November 8, 2002, reply, EPA asserted the following:

> EPA has determined that by letter dated October 21 1997, Oregon conveyed to an EPA staff person "for your information" a report containing the alternative mixing zone rule Plaintiff opposes. Unlike the letter conveying to EPA the 1996 water quality standards revisions, this letter does not seek EPA approval. Nor has EPA ever received a certification from the Oregon Attorney General or other appropriate legal authority within the State that the alternate mixing zone rule was duly adopted pursuant to State law. EPA's regulations provide that a certification from a state Attorney General or other appropriate legal authority "must be included in each State's water quality standards submitted to EPA for review." 40 C.F.R. § 131.6(e). Therefore, this 1997 communication does not constitute a complete "submission" under EPA's regulations and, accordingly, EPA has not acted on it.

Defendants' Reply at 16 (citations omitted).

Although this was the agency's unequivocal position in its November, 2002 brief, the agency's position changed markedly one month later. In a December 20, 2002, letter, EPA claimed that Oregon had in fact properly submitted the rule to the agency in 1997. EPA stated that the alternate mixing zone rule had been the applicable standard under the CWA since 1997. Consequently, one month after arguing that Oregon had never properly submitted the alternate mixing zone rule, the agency stated that the rule had in fact been properly submitted and was binding authority for the previous five years.

If a state adopts a water quality standard that is effective under state law and has been properly submitted to EPA prior to May 30, 2000, then the state standard is the applicable water quality standard for purposes of the CWA until EPA promulgates a different standard. 40 C.F.R. § 131.21(c). This standard applies to the facts at issue because the parties agree that if there was a proper submission by Oregon, it occurred in 1997. Therefore, the issue is whether the alternate mixing zone rule was "submitted to EPA before May 30, 2000." *Id.*

In order for a state to make a proper submission to EPA, the rule must be accompanied by "Certification by the State Attorney General or other appropriate legal authority within the State that the water quality standards were duly adopted pursuant to State law." 40 C.F.R. § 131.6. Oregon submitted a letter to EPA dated October 21, 1997, which told the agency "for your information" a report containing the alternative mixing zone rule is enclosed. The parties agree that as of that date there was no certification from the Secretary of State.

"Although an agency's interpretation of its own regulation is usually given substantial deference, '[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.' " *Community Hosp. of Monterey Peninsula v. Thompson,* 323 F.3d 782, 792 (9th Cir. 2003) (citing *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). Here, EPA has asserted two conflicting positions on a matter that has been before it for over five years. The court defers to EPA's unequivocal statement in its November 8, 2002, reply that Oregon had never properly submitted the alternate mixing zone rule. This interpretation deserves deference over the December, 2002, representation because it appears that the agency reversed its factual contentions in the midst of litigation only after determining that plaintiff had presented a persuasive argument regarding Oregon's improper submission. Such tactics hinder the efforts by the parties and the court to fairly consider the issues involved in the litigation, and deserve no deference.

The court concurs with EPA's prior representations and finds that Oregon never made a proper submission. The agency's own regulation is unequivocal: "The following elements *must* be included in *each* State's *submission* . . . Certification by the State Attorney General or other appropriate legal authority within the State that the water quality standards were duly adopted pursuant to State law." 40 C.F.R. § 131.6 (emphasis added). The "submission" of October 21, 1997, contained no such certification. Notice of the rule was published in the *Oregon Bulletin* on December 1, 1997, but there is no evidence that Oregon made a submission *following* the purported December 1, 1997, certification. Therefore, neither in October or December 1997 did Oregon: (1)

submit a rule to EPA (2) that had already been properly certified. Likewise, EPA never received a properly authenticated submission at any point in 1997 or thereafter.

Declaratory relief is granted for plaintiff on its fifth claim for relief regarding the alternate mixing zone. The court finds that because there has been no effective submission, the standard is not the applicable water quality standard for Oregon under the CWA. Therefore, Oregon's existing mixing zone rule applies until the state properly submits and EPA approves any alternate policy.

## VI. NMFS's Biological Opinion

All federal agencies must conserve species identified as "threatened" or "endangered" under the ESA. 16 U.S.C. § 1531(c)(1). If an agency determines that a proposed action may affect a listed species, it must engage in formal consultation with NMFS or the United States Fish and Wildlife Service (FWS). 50 C.F.R. § 402.14(a). The service must prepare a biological opinion as to whether the action is likely to jeopardize the continued existence of a listed species or adversely modify a critical habitat. The opinion from NMFS or FWS must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3).

The standards of the APA apply to the agency action here. When factual questions involving agency expertise are present, the court should affirm the agency's determination, as long as "there was a rational connection between the facts found in the [biological opinion] and the choice made by the agency." *Southwest Ctr. for Biological Diversity v. Bureau of Reclamation,* 143 F.3d 515, 523 (9th Cir. 1998).

NMFS completed a biological opinion on Oregon's revised water quality standards on July 7, 1999. In its opinion, NMFS concluded that the standards for temperature and IGDO were likely to adversely affect threatened species. NMFS 1 at 17–48. However, NMFS concluded that the standards would not jeopardize the threatened species. EPA approved most of Oregon's standards on July 22, 1999.

The ESA requires NMFS to base its jeopardy analysis on the best available scientific and commercial data. 16 U.S.C. § 1536(a)(2). An agency action may be deemed arbitrary and capricious if it issues a "no-jeopardy finding" that fails to address its own expert's conclusion that the basis of the finding is "scientifically unsound." *Pacific Coast Federation of Fishermen's Assoc. v. NMFS,* 265 F.3d 1028, 1035–38 (9th Cir.2001).

During the review of Oregon's standards, NMFS experts repeatedly found that a no-jeopardy finding was unwarranted. Expert Jefferey Lockwood stated, "I don't see how we could find no jeopardy considering our analysis, as well as EPA's, shows that the water quality standard does not meet the biological requirements of the listed and proposed species." NMFS 61. The agency concluded, "In light of the scientific literature discussed in the biological assessment, it is not clear on what basis EPA determined that an approval action under the CWA is appropriate." NMFS 44 at 3. Further, "NMFS' staff believes that ... the rearing temperature standard is not adequate for the long-term survival and recovery of listed or proposed anadromous salmonids." *Id.* As the citations above indicate, the administrative record is filled with evidence and findings from NMFS that a no-jeopardy finding was unwarranted.

Notwithstanding strong evidence to the contrary, NMFS issued a no-jeopardy finding. NMFS based the finding on a commitment by Oregon to engage in a

"Temperature Criteria Development Project." *See* Defendants' Memorandum in Support of Motion for Summary Judgment at 39 ("NMFS' 'no jeopardy' finding was based, in large part, on the commitment by EPA and Oregon to undertake certain conservation measures"). In a similar challenge, this court has held that EPA "may not rely on plans for future actions to reduce threats and protect a species ...." *Oregon Natural Resources Council v. Daley,* 6 F.Supp.2d 1139, 1154 (D.Or.1998). The agency should "be reasonably certain" that the promised future actions will occur in order to ensure that threatened species will not be harmed by the proposed action. 50 C.F.R. § 402.02.

NMFS's opinion contains no assurances that the state-based commitments on which it rested its no-jeopardy finding were likely to occur. Even though NMFS found that the "final outcomes of these measures are not known," it nonetheless approved the plan because of Oregon's "intent" to minimize harm to threatened species. NMFS 1 at 30. The agency found that certain measures "have the *potential* to meet the biological requirements" of the threatened species some time between 2000 and 2005. *Id.* at 30–36. NMFS has failed to demonstrate a rational connection between the facts before it and the no-jeopardy finding. NMFS's reliance on future state commitments was arbitrary and capricious given the strong evidence in the record counseling against a no-jeopardy finding and indicating that Oregon's "commitments" were largely speculative and unenforceable.

The ESA's language "indicates beyond doubt that Congress intended endangered species to be afforded the highest priorities." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 175, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). NMFS's clear findings prior to the infusion of political pressures from EPA during the review process indicate that a no-jeopardy finding was unwarranted and unsupported by the evidence. Unenforceable promises by the regulated state do not alter that finding. Accordingly, plaintiff's motion for summary judgment on the tenth claim for relief is granted, and NMFS is ordered to withdraw its biological opinion and reinitiate consultation and issue a new opinion. This action shall occur according to the time-line provided below.

## VII. EPA's Duties under the ESA

### A. Section 7(a)(1) Duties

Plaintiff contends that EPA is under a duty to promote species-specific conservation plans. Section 7(a)(1) of the ESA requires agencies to "utilize their authorities in furtherance of the [ESA] by carrying out programs for the conservation of threatened species." 16 U.S.C. § 1536(a)(1). Plaintiff alleges that EPA was required to create a conservation plan for the recovery of listed salmonid and bull trout populations after consultation with NMFS.

The statute does not mention species-specific programs. Rather, the agency may reasonably interpret its § 7(a)(1) obligations to extend no further than engaging in conservation programs that benefit threatened species. The court gives an agency substantial deference in interpreting its own statute. *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 135 (D.D.C.2001). EPA is participating in six water-related conservation programs that assist the relevant threatened species. The agency has rationally concluded that these programs comport with its § 7(a)(1) obligations. Summary judgment is granted to defendants on plaintiff's eighth claim for relief.

### B. Section 7(a)(2) Duties

Plaintiff contends that EPA has violated a mandatory duty under ESA § 7(a)(2) by approving the temperature and IGDO standards. An agency must ensure that an action is not likely to jeopardize threatened species. 16 U.S.C. § 1536(a)(2). The duty to ensure no-jeopardy to the species is independent of the agency's duty to consult with NMFS and is independent of the designated use inquiry. 40 C.F.R. § 131.12(a)(1). EPA's reliance on NMFS opinion must be reasonable. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy,* 898 F.2d 1410, 1415 (9th Cir.1990); *Pacific Northwest Generating Co-op. v. Brown,* 822 F.Supp. 1479, 1487–88 (D.Or.1993). As discussed above, NMFS's no-jeopardy finding was arbitrary and capricious. EPA approved Oregon's standards notwithstanding extensive evidence in the record indicating that the criteria were harmful to the threatened species and in reliance on NMFS's facially arbitrary no-jeopardy determination. *See* Part IV and accompanying discussion on defendants' findings regarding Oregon's water quality standards. NMFS's own opinion concluded that "in light of the scientific literature discussed in the biological assessment, it is not clear on what basis EPA determined that an approval action under the CWA is appropriate." NMFS 44 at 3.

Accordingly, plaintiff's motion for summary judgment on the ninth claim for relief is granted. EPA shall promulgate temperature, IGDO, use designation, and narrative criteria that satisfy the agency's 7(a)(2) obligations or issue a new determination on the existing criteria based on a no-jeopardy finding that is reasonably supported by the available evidence. Defendants' obligation to comply with this order shall comport with the time-line provided below.

## VIII. Motion to Amend

Plaintiff moves to amend the complaint. The proposed amended complaint contains five new claims involving Oregon's alleged failure to adopt adequate toxic water quality criteria under the Clean Water Act.

Leave to amend shall be freely given unless there is undue delay or prejudice to the parties. Fed.R.Civ.P. 15(a). Here, there is significant evidence of undue delay. Plaintiff moved to amend the complaint on December 16, 2002, four months after the motion for summary judgment was filed and five weeks after the parties had completed briefing on the motion. Plaintiff has been aware of the factual basis for the amended claims since February 2002.

The new claims involve state actions, not all of which are related to the issues contained in the current pleadings. A new administrative record would need to be produced, and independent factual and legal questions would need to be considered. It appears that the new claims would greatly expand the scope of litigation that is already wide-ranging. At this stage in the litigation, given the distinct factual basis of the new claims, the court concludes that judicial resources will not be conserved or effectively expended by allowing the amendment. Further, plaintiff has shown no cause for its undue delay. Accordingly, plaintiff's motion to amend the complaint is denied.

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are granted in part and denied in part. Plaintiff's Motion for Summary Judgment (Doc. # 49) on the first, third, fourth, sixth, seventh, ninth, and tenth claims for relief is granted.

Plaintiff's Motion for Summary Judgment on the fifth claim for relief is denied, except for the declaratory relief granted on the alternate mixing zone rule.

Defendants' Motion for Summary Judgment on the second and eighth claims for relief is granted. (Docs.# 66, 70, 76).

Plaintiff's Motion to Amend the Complaint (Doc. # 97) is denied.

Within 30 days of this Order, the parties shall confer and attempt to file a jointly proposed time-line that sets forth the dates by which defendants must comply with the court's order. If the parties are unable to draft a joint proposal, they shall file individual proposals with supporting memoranda detailing a reasonable time-lime. These alternative proposals shall be filed within 30 days of this Order.

IT IS SO ORDERED.